# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

AL-MALIK FRUITKWAN SHABAZZ,
        Petitioner,

No. 3:16-cv-1083 (SRU)

v.

UNITED STATES,
        Respondent.

## RULING AND ORDER

On June 26, 2016, the petitioner Al-Malik Fruitkwan Shabazz (formerly known as

Edward Singer) filed a placeholder version of a successive motion to vacate, set aside, or correct

his sentence in light of the holding in *Johnson v. United States*, 576 U.S. __, 135 S. Ct. 2551

(2015) ("2015 *Johnson*"), which struck down the Residual Clause of the Armed Career Criminal

Act ("ACCA"), 18 U.S.C. § 942(e).[1] (doc. 1) On August 5, 2016, the Second Circuit granted

Shabazz' motion for permission to file a successive petition in the district court. *See* Mandate,

---

[1] The Armed Career Criminal Act provides that when a person violates 18 U.S.C. § 922(g)(1) and has three previous convictions "for a violent felony, or a serious drug offense, or both, committed on occasions different from one another," that person is subject to a mandatory minimum sentence of fifteen years. 18 U.S.C. § 924(e)(1). The term "violent felony" indicates any crime punishable by imprisonment for a term exceeding one year that:

> (i) has as an element the use, attempted use, or threatened use of physical force against the person of another; or
> (ii) is burglary, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another . . . .

18 U.S.C. § 924(e)(2)(B)(i–ii). Subsection (i) is commonly referred to as the "Elements Clause" because, in order to qualify under that subsection, "the use, attempted use, or threatened use of physical force" must be an element of the statute defining the crime of which the defendant was previously convicted. *See Villanueva v. United States*, 2016 WL 3248174, at *1 (D. Conn. June 6, 2016). The first half of subsection (ii) is referred to the "Enumerated Felonies Clause" because it lists four specific types of crimes that qualify as violent felonies. *Id.* The second half of subsection (ii) is referred to as the "Residual Clause" because it has traditionally encompassed felonies that were considered violent notwithstanding the fact that they do not satisfy either the Elements Clause or the Enumerated Felonies Clause. *Id.*

It is the government's burden to establish whether a prior conviction qualifies under section 924(e)(2). *See United States v. Rosa*, 507 F.3d 142, 151 (2d Cir. 2007) (quoting *United States v. Brown*, 52 F.3d 415, 425 (2d Cir. 1995)). If the government meets that burden, the conviction is referred to as a "qualifying conviction."

*Shabazz v. United States*, No. 16-1566 (filed as doc. 4). On September 21, 2016, Shabazz filed a full memorandum in support of his petition. (doc. 5) I asked the parties to submit additional briefing related to whether the government was asserting a "harmless error" defense, (doc. 17), and on November 15, 2017, I held a hearing on the motion, (doc. 20). Both parties also submitted additional briefing following the hearing. (docs. 18, 19, 22)

I hold that Shabazz has met the threshold requirements for a successive habeas petition; I **grant** his petition to vacate his sentence; and I order him to be resentenced. As discussed below, I first determine that Shabazz has shown by a preponderance of the evidence that his petition relies on 2015 *Johnson*, a new rule of constitutional law made retroactive on collateral review, because the silence on this point in the record indicates that I relied on the Residual Clause to determine that his prior robbery convictions could serve as ACCA predicates, justifying the imposition of a sentencing enhancement above what would otherwise have been the statutory maximum sentence for the offense of conviction. *See* 28 U.S.C. § 2244(b)(4) (setting out the requirements for a successive habeas petition). I next consider whether a 2015 *Johnson* constitutional error is comparable to a "trial error" and therefore amenable to harmless error review, *see Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993), or whether it is a "structural error" that "'affect[s] the entire framework in which' an ACCA finding proceeds," *see Villanueva v. United States*, 2016 WL 3248174, at *8 (D. Conn. June 10, 2016) (quoting *Peck v. United States*, 106 F.3d 450, 454 (2d Cir. 1995)). I hold that a 2015 *Johnson* error is a structural error not amenable to harmless error review, and accordingly, having shown that such an error occurred in his case, Shabazz is now entitled to resentencing. I also determine that the same result would be reached using a harmless error review, which review must be conducted using current Supreme Court precedent interpreting ACCA and other federal statutes. *See Rivers v. Roadway Express,*

*Inc.*, 511 U.S. 298, 312–13 (1994) ("A judicial construction of a statute is an authoritative statement of what the statute meant before as well as after the decision of the case giving rise to that construction.").

## I.      Legal Standard

Section 2255 provides a prisoner in federal custody an opportunity to challenge the legality of his or her sentence.  To obtain relief under section 2255, the petitioner must show that his or her prior sentence was invalid because: (1) it was imposed in violation of the Constitution or the laws of the United States; (2) the court lacked jurisdiction to impose the sentence; (3) it exceeded the maximum detention authorized by law; or (4) it is otherwise subject to collateral attack.  28 U.S.C. § 2255(a).

A successive habeas petition, however, must pass through an additional procedural hurdle. Under section 2255(h), a successive habeas petition must be:

> certified as provided in section 2244 by a panel of the appropriate court of appeals to contain-
>
> (1) newly discovered evidence that, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that no reasonable factfinder would have found the movant guilty of the offense; or
>
> (2) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable.

Section 2244, in turn, provides that an application may be granted "only if [the court of appeals] determines that the application makes a prima facie showing that the application satisfies the requirements of this subsection." 28 U.S.C. § 2244(b)(3)(C). The Second Circuit, following other federal courts that have ruled on the issue, has held that "the language 'as provided in section 2244' incorporates the prima facie standard into [the circuit court's] consideration of successive habeas applications under § 2255 and that the same standard applies

3

to both state and federal successive habeas applications." *Bell v. United States*, 296 F.3d 127, 128 (2d Cir. 2002) (citing *Bennett v. United States*, 119 F.3d 468, 469 (7th Cir. 1997)); *see also Herrera-Gomez v. United States*, 755 F.3d 142, 147 (2d Cir. 2014) (asserting that section 2255(h) incorporates "all of the subsections of section 2244 dealing with the authorization of second and successive motions.") (internal quotation marks and citation omitted).

After granting authorization in this case, the Second Circuit instructed this court to apply section 2244(b)(4), which provides that "a district court shall dismiss any claim presented in a second or successive application that the court of appeals has authorized to be filed unless the applicant shows that the claim satisfies the requirements of this section"—namely, for the purposes of this case, that it "relies on a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable." *See* Mandate at 1; *accord Reyes-Requena v. United States*, 243 F.3d 893, 899 (5th Cir. 2001) (holding that section 2244(b)(4) is incorporated into section 2255(h) and that district courts are thereby required to conduct their own threshold inquiry) (collecting cases).

As discussed in more detail below, the parties dispute what is required to make an adequate section 2244(b)(4) showing and how that showing interacts with the harmless error standard articulated by the Supreme Court in *Brecht v. Abrahamson*, 507 U.S. 619 (1993). It remains clear, however, that as with an initial habeas petition, the petitioner bears the overall burden of proving, by a preponderance of the evidence, that he is entitled to relief.  *See Napoli v. United States*, 45 F.3d 680, 683 (2d Cir. 1995).

## II.    Background

On June 24, 2004, a District of Connecticut grand jury returned an indictment charging Shabazz with one count of unlawful possession of a firearm by a convicted felon, in violation of

4

18 U.S.C. §§ 922(g)(1) and 924(e)(1). *See United States v. Singer*, No. 3:04-cr-210-1 (SRU)

(doc. 1). On October 27, 2004, a jury found Shabazz guilty of the charged offense.[2] *Id.* (doc. 71)

The parties appear to have assumed without discussion that, based on Shabazz's criminal

history, he would be subject to a sentencing enhancement under ACCA. The Presentence Report

("PSR"), without much discussion, determined that Shabazz was subject to that enhancement on

the basis of "four violent felonies," apparently referring to convictions for first degree and

second degree robbery committed on separate occasions with the disposition date of March 15,

1991,[3] and two convictions for first degree robbery committed on separate occasions with the

disposition date of June 24, 1991. On April 5, 2005, I sentenced Shabazz to 235 months of

imprisonment, which term incorporated the fifteen-year ACCA mandatory minimum and ran

concurrently with the undischarged portions of Shabazz's remaining state sentence. *Id.* (doc. 88).

Both in the sentencing memoranda submitted by the parties and at the sentencing hearing, the

application of ACCA was assumed without any substantive objection or discussion.

Shabazz timely appealed his sentence, arguing that the district court erred by failing to

instruct the jury on a justification defense and by denying his motion for a mistrial on the basis of

a colloquy with one of the jurors during the announcement of the verdict. On July 20, 2007, the

---

[2] I note what appears to be a technical error in the verdict form—the jury was given only one space to indicate whether Shabazz was guilty of violating both section 922(g)(1) and 924(e)(1). *United States v. Singer*, No. 3:04-cr-210-1 (SRU) (doc. 71) The jury was not presented with any facts regarding whether Shabazz had violated ACCA, and moreover, would not have been the appropriate decision-maker to determine whether Shabazz's prior convictions met the requirements of a "violent felony" under that statute.

[3] I note that in its discussion of ACCA's applicability, the PSR simply indicated that the predicate violent felonies had disposition dates of March 15, 1991 and June 24, 1991. In its criminal history discussion, the PSR separately stated that Shabazz was convicted on two counts of second degree robbery and one count of first degree robbery on March 21, 1991, PSR at ¶¶ 31, 33, 34; and of two counts of first degree robbery on June 24, 1991, PSR at ¶¶ 32, 36. The first degree robbery and one of the second degree robbery convictions imposed on March 15, 1991 apparently occurred on the same date. I assume for the purposes of simplicity that the relevant offenses at issue here are the three first degree robbery convictions, and the second degree robbery conviction committed on a different date from the first degree robbery. *See* 18 U.S.C. § 924(e)(1) (requiring that the prior convictions be "committed on occasions different from one another").

5

Second Circuit affirmed the judgment of the district court by summary order. *United States v. Singer*, 241 F. App'x 727, 729 (2d Cir. 2007).

On December 21, 2012, Shabazz filed his first federal habeas petition.[4] 1st Habeas Petition, *Shabazz v. United States*, 3:12-cv-1825 (SRU) (doc. 1). He argued that he should not have been subject to the ACCA enhancement because two of his prior convictions—for first degree escape and third degree burglary—were not "violent felonies" under the statute. *Id.* On December 16, 2013, I denied that petition as barred by the one-year statute of limitations for section 2255 petitions. Order, *Shabazz v. United States*, 3:12-cv-1825 (SRU) (doc. 21). I also observed that "Shabazz appears to have as many as five other prior convictions that would qualify as ACCA predicates, i.e., first and second degree burglary." *Id.* at 2–3.

On October 19, 2015, following the Supreme Court's decision in *Johnson v. United States*, 135 S. Ct. 2551 (2015), Shabazz filed a *pro se* application in the Second Circuit seeking authorization to file a second section 2255 petition. *Shabazz v. United States*, No. 15-3306 (2d Cir.) (doc. 1) Counsel appeared, and on November 13, 2015, filed a memorandum in support of Shabazz's petition asserting that, through the retroactive application of 2015 *Johnson*, Shabazz's prior robbery convictions could no longer be considered categorically violent felonies. *Shabazz v. United States*, No. 15-3306 (doc. 25). The Second Circuit initially denied Shabazz's motion, observing that even if 2015 *Johnson* should be applied retroactively, his three convictions for first degree robbery, which the court described as "violent felonies," would nevertheless prevent him from successfully challenging the ACCA enhancement. Order, *Shabazz v. United States*, No. 15-3306 (2d Cir. Nov. 17, 2015) (doc. 33); *see also* Order, *Shabazz v. United States*, No. 15-3306 (2d Cir. Nov. 24, 2015) (doc. 39) (permitting supplemental briefing but denying petition).

---

[4] Shabazz's petition indicates that he also previously attempted to file habeas claims in state court.

On May 17, 2016, following the Supreme Court's decision in *Welch v. United States*, 136 S. Ct. 1257 (2016), which held conclusively that 2015 *Johnson* should be applied retroactively, Shabazz filed a second application for permission to file a second section 2255 petition. *Shabazz v. United States*, No. 16-1566 (docs. 1 and 2). In a memorandum in support of his renewed petition, Shabazz argued that the Second Circuit's prior denial of his 2015 motion was inconsistent with its subsequent grant of similar petitions where the petitioner also had prior first and second degree Connecticut robbery convictions. *Shabazz v. United States*, No. 16-1566 (doc. 2). On August 5, 2016, the Second Circuit granted Shabazz's motion to file a second section 2255 petition. Order, *Shabazz v. United States*, No. 16-1566 (2d Cir. Aug. 5, 2016) (doc. 33).

The instant petition followed.[5]

## III.    Discussion

Shabazz argues that, after 2015 *Johnson*, he no longer qualifies for an ACCA sentence because his prior robbery convictions do not categorically[6] qualify as predicates under the statute.[7] If Shabazz received a sentencing enhancement on the basis of convictions that only qualified as ACCA predicates under the Residual Clause then his Fifth Amendment Due Process rights have been violated, his sentence is illegal, and his petition to vacate that sentence must be granted.

---

[5] Shabazz filed a placeholder motion on June 26, 2016 in accordance with the District's June 14, 2015 Standing Order on 2015 *Johnson* cases, and filed an amended motion on September 21, 2016.

[6] This Order assumes the reader's familiarity with the categorical and modified categorical approaches. For a full discussion of those concepts, see *Wiggan v. United States*, 2016 WL 4179838, at *5–6 (D. Conn. Aug. 5, 2016).

[7] Shabazz also had prior convictions for third degree burglary and escape. I have previously held that third degree burglary is not categorically an ACCA predicate, and the Second Circuit has held that first degree escape is not a categorical predicate. *See United States v. Alvarado*, 2013 WL 662659, at *7 (D. Conn. Feb. 25, 2013) (third degree burglary); *United States v. Mills*, 570 F.3d 508, 512 (2d Cir. 2009) (first degree escape). The government has not indicated that it intends to provide additional documentation establishing those convictions as ACCA predicates, so I do not discuss them further here.

In order to determine whether Shabazz is entitled to that relief, first, I must consider whether his petition adequately alleges that his original sentence erroneously relied on the Residual Clause, and thereby adequately "relies on" 2015 *Johnson* for the purposes of section 2244(b)(4). Having determined that Shabazz has made that threshold showing, I next consider whether granting Shabazz's petition would nevertheless be futile because, looking to the larger legal context, the 2015 *Johnson* error did not change the outcome of his case.

A.  Threshold Inquiry: Whether the Successive Petition Relies on 2015 *Johnson*

As discussed above, the Second Circuit has instructed me to first determine whether Shabazz's petition "relies on a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable." *See* Mandate at 1. 2015 *Johnson* is such a new rule, *see Welch*, 136 S. Ct. at 1265, and accordingly, any sentence based on ACCA's Residual Clause carries a constitutional error.

In order to file a petition under 2015 *Johnson*, however, Shabazz must also show by a preponderance of the evidence that he was, in fact, subject to a 2015 *Johnson* error. *Villanueva v. United States*, 2016 WL 3248174, at *3 (D. Conn. June 10, 2016). In conducting this threshold inquiry, I follow the lead of other courts that have analogized a 2015 *Johnson* to a general verdict reached after an erroneous jury instruction. *See United States v. Winston*, 2016 WL 4940211, at *6 (W.D. Va. Sept. 16, 2016) (collecting cases). The "reliance" inquiry thus concerns itself with the specific facts of this case—it considers whether the sentencing judge actually used the Residual Clause, or whether it is possible to discern some adequate alternate basis for the sentence from the record.

Neither party has substantively addressed this aspect of the "reliance" question, so I touch on it only in brief. I reviewed the PSR, sentencing memoranda, and sentencing transcript in

Shabazz's criminal case and none of those documents discussed under which ACCA clause the robbery predicates qualified; however, I find compelling the arguments from other courts that such a silence in the record should be read in favor of the petitioner because the Residual Clause, written to be a capacious catch-all, was the most direct and efficient route to establishing an ACCA predicate at the time. *See, e.g.*, *id.* at \*3 (holding that the absence of discussion suggested that the Residual Clause had been relied upon because it was "the most obvious path" to an ACCA predicate; it would "readily have encompassed" the relevant crime; and, unlike the Elements Clause, would have required "a minimum of statutory analysis"). Moreover, requiring a petitioner to make an affirmative showing on a record that is not only more than ten years old, but was made at a time when I had no reason to identify on which ACCA clause his sentence relied would be inequitable and would render 2015 *Johnson* relief virtually impossible to obtain. *See In re Chance*, 831 F.3d 1335, 1340 (11th Cir. 2016) (observing that if silence about the applicable clause was read against a petitioner despite the fact that the sentencing judge was not then required to identify which clause was relied upon, the petitioner "could not benefit from that binding precedent except in the rare instances where the sentencing judge thought to make clear that she relied on the residual clause. That is not right."); *Simmons v. United States*, 2016 WL 4536092, at \*1 (S.D. Fla. Aug. 31, 2016) (same); *United States v. Wolf*, 2016 WL 6433151, at \*3 (M.D. Pa. Oct. 31, 2016) (same); *United States v. Winston*, 2016 WL 4940211, at \*7 (W.D. Va. Sept. 16, 2016) (observing that "there was no reason for a sentencing judge, pre-[2015 *Johnson*], to identify the specific clause for an ACCA predicate offense"). Accordingly, I determine that Shabazz has adequately shown that he was sentenced under the Residual Clause, and is now entitled to raise a successive habeas claim under 2015 *Johnson*.

The government's primary argument that Shabazz's claim does not adequately "rely" on 2015 *Johnson* is based on the fact that Shabazz's claim *also* relies on 2010 *Johnson*. There is no dispute that Shabazz would not be permitted to file a second or successive habeas on the sole basis of 2010 *Johnson*—the Second Circuit has repeatedly held that 2010 *Johnson* concerned the interpretation of ACCA, rather than announcing a new rule of constitutional law, *see, e.g.*, *Belk v. United States*, 2016 WL 1587223, at *1 (2d Cir. Apr. 19, 2016); moreover, the one-year statute of limitations under AEDPA for filing a petition based on 2010 *Johnson* has long-since run, *see* 28 U.S.C. § 2255(f)(3).

Although Shabazz's Elements Clause argument engages with the 2010 *Johnson* holding, the availability of that argument in his case is wholly a product of the new rule announced in 2015 *Johnson*. Prior to 2015 *Johnson*, Shabazz would not have had a viable challenge to his predicate robbery convictions because the Residual clause would have picked up wherever the Elements clause left off. "It is only as a result of 2015 *Johnson*'s voiding of the residual clause that [Shabazz] could reasonably argue that he is no longer eligible for the ACCA enhancement." *Diaz v. United States*, 2016 WL 4524785, at *5 (W.D.N.Y. Aug. 30, 2016), *reconsideration denied,* 2016 WL 5404582 (W.D.N.Y. Sept. 28, 2016) (internal quotation marks and citation omitted); *see also Chance*, 831 F.3d at 1341 n.5 ("[A]n inmate's sentence that was valid up until the moment [2015] *Johnson* was decided was not only ultimately invalidated by *Descamps*, it was invalidated by [2015] *Johnson*.") (internal citation omitted); *United States v. Pena*, 161 F. Supp. 3d 268, 275 n.3 (S.D.N.Y. 2016) (observing that by removing the Residual Clause, 2015 *Johnson* rendered viable arguments that Hobbs Act robbery was not a crime of violence under the Elements Clause).

In sum, I find that Shabazz has met the threshold requirements for filing a successive habeas petition.

### B.   The *Brecht* Harmless Error Standard

The government asserts that, in addition to passing the threshold requirements for a successive petition, Shabazz must also show that the 2015 *Johnson* error caused him "actual prejudice," which, it further asserts, he cannot do. Gov't's Am. Post-Hearing Br. at 1–2 (doc. 19). In other words, the government asserts that Shabazz's petition should not be granted because removing the 2015 *Johnson* error would not change the outcome of his case. That argument is based on the "harmless error" standard articulated in *Brecht v. Abrahamson*, 507 U.S. 619 (1993). Several judges, myself included, have applied *Brecht*'s harmless error standard to successive petitions based on 2015 *Johnson* without much discussion. *See Wiggan v. United States*, 2016 WL 4179838 (D. Conn. Aug. 5, 2016); *United States v. Hicks*, 2016 WL 5672949, at *3 (N.D. Cal. Oct. 3, 2016) (collecting cases); *see also In re Leonard*, 2016 WL 3885037, at *11 n.10 (11th Cir. July 13, 2016) (Martin, J. concurring) (observing that prior to the 2015 *Johnson* cases, the Eleventh Circuit had never before applied the harmless error standard in the successive habeas context, and expressing concern that it did so without the benefit of briefing). I now believe that I erred by applying the harmless error standard in this context,[8] and agree with Chief Judge Janet C. Hall's determination in *Villanueva v. United States*, 2016 WL 3248174 (D. Conn. June 10, 2016), that a 2015 *Johnson* error is a structural error not amenable to *Brecht*'s harmless error review. *Id.* at *8.

Before delving into the applicability of the *Brecht* standard itself, however, I must resolve the parties' debate over who bears the burden on that issue. At the hearing, the government

---

[8] I note, however, that my application of the harmless error standard in *Wiggan* was inconsequential because I determined that the error in that case was not harmless. *See* 2016 WL 4179838, at *16.

rejected the suggestion that it was making a "harmless error" argument because it asserted that the burden remained on the petitioner to show prejudice, rather than on the government to show harmlessness. In its post-hearing briefing on the same issue, the government relies on *Brecht* and cases quoting *Brecht* for the proposition that the burden is on the petitioner to show "actual prejudice." *See* Gov't's Am. Post-Hearing Br. at 1–2.

There appears to be some ambiguity on that point in the *Brecht* decision itself: the majority adopted its harmless error standard from *Kotteakos v. United States*, 328 U.S. 750 (1946), which, as Justice Stevens observed in his concurrence, "places the burden on prosecutors to explain why [constitutional trial errors] were harmless." 507 U.S. at 640 (Stevens, J. concurring). Justice White's dissent, however, observes critically that majority had, in fact, "impose[d] on the defendant [presumably meaning the petitioner] the burden of establishing that the error 'resulted in "actual prejudice."'" *Id.* at 647 (White, J. dissenting). In *O'Neal v. McAninch*, 513 U.S. 432 (1995), the Court suggested that *Brecht*'s ambiguity might be deliberate, asserting that this issue should not be thought of in terms of burdens at all, but rather in terms of whether the legal standard is met. *See id.* at 436–37. Nevertheless, the Court held that if the reviewing court is in truly equipoise, the error should be treated as not harmless. *Id.* at 435; *see also id.* at 439 (observing that both of the earlier standards on which the *Brecht* Court relied "plac[ed] the risk of doubt on the State"). Subsequent Supreme Court cases have apparently adopted the view that the burden remains with the government. *See Fry v. Pliler*, 551 U.S. 112, 121 n.3 (2007) (in response to the question of who bears the burden of persuasion on *Brecht* issues, observing that the State had consistently conceded that it bore the burden) (citing *O'Neal*); *United States v. Dominguez Benitez*, 542 U.S. 74, 82 n.7 (2004) (in the context of direct review, observing that "[w]hen the Government has the burden of showing that constitutional

trial error is harmless because it comes up on collateral review, the heightened interest in finality generally calls for the Government to meet the more lenient *Kotteakos* standard") (citing *Brecht*). Regardless, allocation of the "burden" does not appear to be meaningful here where the issue is purely a question of law, rather than of fact, and there is no suggestion that the issue has been waived by the government if it does, indeed, carry the burden of arguing harmless error as a defense.

1.      *Applicability of the* Brecht *Harmless Error Standard*

The *Brecht* Court had to decide which harmless error standard was appropriate to evaluate a section 2254 habeas claim by a state prisoner who asserted that his conviction rested on unconstitutional references to his post-arrest silence during the trial. In that case, the Court rejected the application of the harmless error test articulated in *Chapman v. California*, 386 U.S. 18 (1967), which placed the burden on the State to show that the constitutional error was "harmless beyond a reasonable doubt," in favor of a more lenient standard. *See* 507 U.S. at 622–23. The *Brecht* Court considered three factors in determining the appropriate standard for harmless error review: (1) the nature of the constitutional error at issue, *id.* at 629–30; (2) the effect on finality, *id.* at 633–34; and (3) concerns about the infringement on state sovereignty, including the burdens imposed by a retrial, *id.* at 635–37.

With respect to the nature of the constitutional error at issue, the *Brecht* Court established a spectrum from "trial error" to "structural error" as follows:

> Trial error "occur[s] during the presentation of the case to the jury," and is amenable to harmless-error analysis because it "may ... be quantitatively assessed in the context of other evidence presented in order to determine [the effect it had on the trial]." [*Arizona v. Fulminante,* 499 U.S. 279, 307–08 (1991)]. At the other end of the spectrum of constitutional errors lie "structural defects in the constitution of the trial mechanism, which defy analysis by 'harmless-error' standards." *Id.,* at 309. The existence of such defects—deprivation of the right to counsel, for example—requires

> automatic reversal of the conviction because they infect the entire trial
> process.

*Id.* at 629–30. It ultimately held that its new harmless error rule applied only to the former

category, namely, "constitutional errors of the trial type." *Id.* at 638.

In *Villanueva*, Chief Judge Hall observed that 2015 *Johnson* appears to present a

structural rather than a trial error because invalidation of the Residual Clause "'affect[s] the

entire framework in which' an ACCA finding proceeds." 2016 WL 3248174, at *8 (quoting *Peck*

*v. United States*, 106 F.3d 450, 454 (2d Cir. 1995)). She illustrated the point as follows:

> Without the Residual Clause, the entire structure of the ACCA proceeding
> at sentencing would have been different: counsel would have raised
> different arguments concerning ACCA eligibility and the court would
> have been forced to engage in analysis that the Residual Clause otherwise
> enabled it to avoid.

*Id.* I agree with her determination—the Residual Clause was applied to the vast majority of cases

in which the Elements Clause would otherwise have been implicated and was a much simpler

route to finding a predicate conviction; accordingly, its presence impeded my exploration of the

applicability of the Elements Clause in the present case, and has had the same effect on the law

more generally. There is no way to know how I would have received an Elements Clause

argument in Shabazz's case, nor how I would have analyzed it on a legal landscape that lacked

the Residual Clause as a backup. Put another way, there was no "other evidence presented"

against which to assess the impact of a 2015 *Johnson* error.

That a 2015 *Johnson* claim is not amenable to harmless error review is underscored by

the observation that most of the principles on which the *Brecht* Court relied do not seem to have

any relevance to the present circumstances. For instance, when discussing the importance of

finality as a justification for different standards for direct and collateral review, the *Brecht* Court

invoked the retroactivity doctrine. *See id.* at 634 (observing that new rules only "seldom have

retroactive application to criminal cases on federal habeas) (citing *Teague v. Lane*, 489 U.S. 288, 305–10 (1989) (O'Connor, J.)). Shabazz's entire claim, by contrast, is permitted only because of a recognized and codified exception to that retroactivity doctrine. *See Welch*, 136 S. Ct. at 1265 ("[2015] Johnson is thus a substantive decision and so has retroactive effect under *Teague* in cases on collateral review.").

       With respect to *Brecht*'s concerns about comity and federalism, I concede that *Brecht* has been routinely applied in the section 2255 context. *See, e.g.*, *Underwood v. United States*, 166 F.3d 84, 87 (2d Cir. 1999) (applying *Brecht*'s harmless error standard to section 2255 petition); *United States v. Dago*, 441 F.3d 1238, 1246 (10th Cir. 2006) (applying *Brecht* in the section 2255 context because its reasoning is, "more than anything else, motivated by 'considerations underlying our habeas jurisprudence,' that apply equally to collateral attacks on both federal and state convictions") (quoting *United States v. Montalvo*, 331 F.3d 1052, 1057–58 (9th Cir. 2003)); *see also United States v. Vonn*, 535 U.S. 55, 63 (2002) (assuming that *Brecht* applies in the section 2255 context). Nevertheless, it must be admitted that there is no meaningful comparison between requiring a federal judge to defer to a state court judge regarding the subjective question of how much impact constitutionally inappropriate evidence may have had during a state court criminal trial and requiring me, as both the sentencing and the habeas judge in this case, to defer to my own prior application of a statutory provision—and, implicitly, the entire body of law relying on that provision—that was only *subsequently* determined to be unconstitutionally vague. That Shabazz's claim involves a sentencing enhancement rather than a trial issue, too, changes the calculus—*Brecht*'s concern about the "social costs" of a re-trial, which included the time and money involved as well as the difficulties of trying a case long after the events at issue, are not present here.

In sum, I hold that a 2015 *Johnson* error is a structural one not amenable to *Brecht*'s harmless error review. Because Shabazz has shown by a preponderance of the evidence that such an error occurred, his sentence must be vacated and he is now entitled to resentencing. In recognition that classifying 2015 *Johnson* errors as structural is a "minority view," *United States v. Hicks*, 2016 WL 5672949, at *3, however, in the following section I demonstrate that conducting a harmless error review in the manner that other courts have done in the 2015 *Johnson* context would lead to the same result because the error in this case was not "harmless."

2.   *Application of the* Brecht *Harmless Error Standard*

*Brecht*'s harmless error standard directs me to consider whether the 2015 *Johnson* error in Shabazz's case had a "substantial and injurious effect" that resulted in "actual prejudice" to the petitioner. *Brecht*, 507 U.S. at 623 (internal citations omitted). If, however, I have "grave doubt" concerning whether the error had "a substantial effect or influence on determining" the sentence, the error cannot be deemed harmless. *O'Neal*, 513 U.S. at 435.

The government argues that the 2015 *Johnson* error was harmless in Shabazz's case because his robbery convictions still qualify under ACCA's Elements Clause. It reaches that conclusion using two alternative paths. First, it argues that the harmless error standard must be assessed using the law at the time of sentencing, although it provides no citations in support of that argument. [9] *See* Gov't's Post-Hearing Br. at 2 ("Intervening cases that have *not* been held retroactive on collateral review may not enter into this error/prejudice analysis.") (emphasis in original). Accordingly, because Shabazz's merits argument relies on an interpretation of ACCA

---

[9] The government's argument that 2010 *Johnson* should not apply to Shabazz's petition may also be understood as another way of asserting that the petition does not adequately "rely" on 2015 *Johnson* to constitute a permissible second / successive habeas. *See, e.g.*, *Alexander v. United States*, 2016 WL 6436255, at *1 (7th Cir. May 26, 2016) (denying authorization under section 2255(h) because "[a]lthough Alexander cites the recent decision in [2015] *Johnson*, the claim actually relies on an earlier *Johnson* decision: *Johnson v. United States*, 559 U.S. 133 (2010)"). Those arguments have been addressed and rejected above.

first announced in 2010 *Johnson*, the government argues that his claim must fail. In the

alternative, the government argues that even if 2010 *Johnson* is available for Shabazz's claim,

his prior robbery convictions would still be qualifying offenses under the Elements Clause. I

address each of those arguments in turn.

      a.   Whether 2010 *Johnson* May Be Considered

Some summary orders issued by the Second Circuit seem to implicitly endorse the

government's view that prejudice should be assessed using the law at the time of the sentencing.

For instance, in *Belk v. United States*, 2016 WL 1587223 (2d Cir. Apr. 19, 2016), the Court held

in a non-binding summary order that a similarly situated post-2015 *Johnson* petitioner who had

first degree robbery convictions under New York law was not entitled to file a second or

successive habeas petition because:

> at the time of his sentencing, it was clearly established in this Circuit that
> Petitioner's robbery convictions qualified as ACCA predicates under §
> 924(e)(2)(B)(i), which was not invalidated by [2015] *Johnson.*

*Id.* at *1 (internal citations omitted). *Belk*'s use of the phrase "clearly established" suggests that

whether a petitioner was prejudiced by the constitutional error identified in 2015 *Johnson* should

be assessed at the time that the sentencing took place.

Some district courts have relied on the Supreme Court's holding in *Lockhart v. Fretwell*,

506 U.S. 364 (1993), to support the proposition that the court should apply current case law in a

harmless error review. *See, e.g.*, *Diaz*, 2016 WL 4524785, at *5; *United States v. Ladwig*, 2016

WL 3619640, at *5 (E.D. Wash. 2016); *see also Villanueva*, 2016 WL 3248174, at *15

(observing that restricting the prejudice inquiry to the law as it stood at the time of the error was

"at odds with, for example, the prejudice prong of *Strickland v. Washington*, 466 U.S. 668

(1984), which is conducted with today's law.") (internal citation omitted). *But see King v. United*

*States*, 2016 WL 4487785, at *9 n.14 (S.D. Fla. Aug. 24, 2016) (asserting that those cases

overstate the *Lockhart* holding).

The Eleventh Circuit's voluble debate over whether 2015 *Johnson* petitioners should be

able to "retroactively" take advantage of the Supreme Court's recent articulation of the modified

categorical approach in *Descamps v. United States*, __ U.S. __, 133 S. Ct. 2276 (2013), however,

offers a better solution to the present problem. In the dicta of an order authorizing a successive

petition, one panel of the Eleventh Circuit makes a powerful argument for applying intervening

Supreme Court precedents:

> No matter what the [sentencing] judge said, it is precedent from the
> Supreme Court and this Court that dictates which offenses meet [the
> statute's] definitions. *See Rivers v. Roadway Express, Inc.*, 511 U.S. 298,
> 312–13, 114 S. Ct. 1510, 128 L. Ed. 2d 274 (1994) ("It is this Court's
> responsibility to say what a statute means, and once the Court has spoken,
> it is the duty of other courts to respect that understanding of the governing
> rule of law. A judicial construction of a statute is an authoritative
> statement of what the statute meant *before as well as after the decision of
> the case giving rise to that construction*." (emphasis added)).

*In re Chance*, 831 F.3d 1335, 1341 (11th Cir. 2016); *see also In re Adams*, 825 F.3d 1283, 1286

(11th Cir. 2016) ("[W]e should look to guiding precedent, such as *Descamps*, to ensure we apply

the correct meaning of the ACCA's words.") (citing *Rivers*). Put another way, it is appropriate to

apply 2010 *Johnson* to the present claim because that case simply revealed, rather than changed,

the meaning of ACCA *at the time that Shabazz was sentenced.*

By contrast, the decisions arguing against the use of *Descamps* and other intervening

Supreme Court precedents mistakenly premise their reasoning on principles of finality and

distinctions between first and second or successive habeas petitions. For instance, in *Leone v.

United States*, 2016 WL 4479390 (S.D. Fla. Aug. 24, 2016), the district court justified its

position by discussing at length the "principles of finality" articulated in *Teague* and codified by

AEDPA. *See id.* at *7. But when the Supreme Court announces a new rule of constitutional law

18

that has been made retroactive on collateral review, it is essentially directing that those finality

concerns should be disregarded in that circumstance; indeed, it is identifying a case in which one

of *Teague*'s recognized exceptions should apply.

In the same vein, the *Leone* district court emphasized the distinction Congress made

between first and second or successive habeas petitions. *Id.* at *8. But, as discussed at length

above, the stringent gateway requirements allowing me to hear this successive petition have

already been met. Those are jurisdictional requirements. Once I have determined that I can hear

the claim, however, AEDPA gives no indication that a successive petition should be treated any

differently than an initial habeas petition on the merits.

Finally, there are other strong policy arguments in favor of applying the current legal

understanding of ACCA. As the district court in *United States v. Ladwig*, 2016 WL 3619640

(E.D. Wash. 2016), observed:

> An inquiry that requires judges to ignore intervening decisions that, to
> some degree, clear the mire of decisional law [created by 2015 *Johnson*]
> seems to beg courts to reach inconsistent results. Current case law has
> clarified the requisite analysis and applying that law should provide
> greater uniformity, helping to ensure that like defendants receive like
> relief.

*Id.* at *5; *see also Diaz*, 2016 WL 4524785, at *5 (approvingly quoting same). Accordingly, I

determine that 2010 *Johnson* and other intervening Supreme Court precedents should be applied

when assessing the "harmlessness" here.

> b.   Harmless Error Analysis Using 2010 *Johnson*

In 2010 *Johnson*, the Supreme Court held that the use of the phrase "'physical force' [in

the Elements clause] means *violent* force—that is force capable of causing physical pain or

injury to another person." 559 U.S. at 140 (emphasis in original). Shabazz's robbery convictions

can only serve as ACCA predicates under the Elements Clause if a conviction under the relevant statutory provision necessarily requires the use of such force as an *element* of the conviction.

Connecticut's robbery statutes consist of a basic robbery definition and additional aggravating factors that increase the severity of the offense. Accordingly, I begin with an analysis of whether the basic robbery statute itself requires a sufficient level of force. Section 53a–133 of the Connecticut General Statutes defines a basic robbery as follows:

> [a] person commits robbery when, in the course of committing a larceny, he uses or threatens the immediate use of physical force upon another person for the purpose of: (1) Preventing or overcoming resistance to the taking of the property or to the retention thereof immediately after the taking; or (2) compelling the owner of such property or another person to deliver up the property or to engage in other conduct which aids in the commission of the larceny.

The state of the law on whether that basic robbery definition meets the 2010 *Johnson* definition of violent force is in flux. In 2013, the Second Circuit stated in a summary order that:

> first degree robbery under Connecticut law falls squarely within the first prong of the definition of "violent felony," which covers offenses having "as an element the use, attempted use, or threatened use of physical force against the person of another."

*United States v. Wiggan*, 530 F. App'x 51, 57 (2d Cir. 2013); *see also McCarthy v. United States*, No. 15-2543 (2d Cir. March 15, 2016) (observing that petitioner's prior Connecticut robbery conviction "still qualifies as a 'violent felony' because it had 'as an element the use, attempted use, or threatened use of physical force against the person of another.'") (quoting 18 U.S.C. § 924(e)(2)(B)(i)). The Second Circuit in *Wiggan* did not discuss the 2010 *Johnson* decision, but it did rely on, *inter alia*, the Second Circuit's interpretation of New York's substantially similar robbery statute. *See Wiggan*, 530 F. App'x at 57 (citing *United States v. Brown*, 52 F.3d 415, 425–26 (2d Cir. 1995)).

On July 21, 2016, however, the Second Circuit held in *United States v. Jones*, No. 15-1518-cr, 830 F.3d 142 (2d Cir. 2016),[10] that New York's first degree robbery statute could no longer be considered a categorical "crime of violence" under the Career Offender Guideline, which includes language largely identical to ACCA's Elements, Enumerated, and Residual Clauses. The *Jones* Court determined that the element of "forcible stealing" in the New York statute—which is identical to section 133[11]—did not always require "force capable of causing physical pain or injury to another." *Id.* at 15–16 (quoting 2010 *Johnson*). To come to that conclusion, it pointed to New York Appellate Division decisions indicating that the requisite force for "forcible stealing" could be established by less than violent force. *Id.* at 14–15. The *Jones* Court asserted that, in the absence of "persuasive data" that the New York Court of Appeals would overturn any of those decisions and hold that "forcible stealing" always required sufficiently violent force, it could rely on those cases as indicative of what level of force was required. *Id.* at 14 (citing *Michalski v. Home Depot, Inc.*, 225 F.3d 113, 116 (2d Cir. 2000) (in the diversity context, stating that "[t]he holding of an intermediate appellate state court is a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise.") (citation omitted)).

---

[10] Because, as discussed below, *Jones* was subsequently vacated and withdrawn from publication, citations here are to the opinion as docketed in *United States v. Jones*, No. 15-1518-cr (doc. 97) (2d Cir. July 21, 2016).

[11] "Forcible stealing," the New York equivalent of section 133, is defined as follows:

> A person forcibly steals property and commits robbery when, in the course of committing a larceny, he uses or threatens the immediate use of physical force upon another person for the purpose of: 1. Preventing or overcoming resistance to the taking of the property or to the retention thereof immediately after the taking; or 2. Compelling the owner of such property or another person to deliver up the property or to engage in other conduct which aids in the commission of the larceny.

N.Y. Penal Law § 160.00.

A subsequent Second Circuit decision called the scope of the *Jones* ruling into question. In *United States v. Hill*, 832 F.3d 135 (2d Cir. 2016), the Second Circuit rejected the argument that a Hobbs Act Robbery no longer categorically constituted a "crime of violence" for the purpose of section 924(c)(3)(A), the firearm / drug enhancement. The *Hill* Court asserted in footnote that *Jones* was inapplicable to the case before it because the *Jones* Court was considering a different robbery statute, and because the definition of "crime of violence" in the Career Offender Guideline and in ACCA was distinguishable from the definition provided in section 924(c)(3)(A). *Id.* at 144 n.13. Nevertheless, the *Hill* Court suggested a limitation on the extension of *Jones'* reasoning when it sternly rebuked Hill for relying on outlandish hypotheticals to illustrate that the elements of a Hobbs Act robbery could be met using non-forceful means, and therefore could not serve as a predicate offense. It observed that those hypothetical situations were "insufficient because a defendant is required to 'point to his own case or other cases in which the . . . courts in fact did apply the statute' in such a manner to show that there is a 'realistic probability' that the Hobbs Act would reach the conduct Hill describes." *Id.* at 142–43 (quoting *Gonzales v. Duenas–Alvarez*, 549 U.S. 183, 193 (2007)); *see also id.* at 139 ("Critically, the Supreme Court has made clear in employing the categorical approach that to show a predicate conviction is not a crime of violence 'requires more than the application of legal imagination to [the] . . . statute's language.'") (quoting *Duenas-Alvarez*).

When *Wiggan* returned to me on remand after *Jones* and *Hill* had been decided, I declined to consider whether a conviction under Connecticut's first degree robbery still constituted a "violent felony" after *Jones*. *Wiggan v. United States*, 2016 WL 4179838, at *9 (D. Conn. Aug. 5, 2016). Instead, I held that the Second Circuit's ruling in *Wiggan* controlled due to the "law of the case" doctrine, *id.*, although I observed in a footnote that *Hill*'s rejection of a

22

hypotheticals-based approach indicated "[t]he continued vitality of the Second Circuit's holding regarding Connecticut's first degree robbery statute," *id.* at 9 n.9. Thereafter, the Second Circuit increased uncertainty in this area by vacating *Jones* in light of the Supreme Court's grant of certiorari in *Beckles v. United States*, No. 15–8544, a case that will consider the effect of 2015 *Johnson* on the Career Offender guideline. *See United States v. Jones*, 838 F.3d 296 (2d Cir. 2016).

As applied to the present case, the reasoning of *Jones* and *Hill* directs me to proceed as follows: I should first look to the Connecticut Supreme Court's interpretation of the statute. *See 2010 Johnson*, 559 U.S. at 138. In the absence of a direct ruling from that Court, I may also consider intermediate appellate state court decisions as well as "other persuasive data" regarding how the Connecticut Supreme Court might rule. *Michalski*, 225 F.3d at 116. Hypothetical exercises of counsel's "legal imagination," however, cannot provide such data. *See Hill*, 832 F.3d at 139 (quoting *Duenas–Alvarez*, 549 U.S. at 193).

Shabazz has identified several Connecticut Supreme Court cases indicating in dicta that Connecticut's basic robbery statute criminalizes non-qualifying conduct. *See* Pet.'s Reply Br. at 4–5. In *State v. Wright*, 246 Conn. 132 (1998), the strongest of those cases, the Court observed in the context of discussing the legislature's decision to classify third degree robbery as a Class D rather than a Class C felony that:

> the force used or threatened in a simple robbery is typically of a relatively low level . . . . At its mildest, such force conceivably could involve no more than a threat of a pinch, a scratch or a slap.

*Id.* at 147; *see also State v. Reed*, 157 Conn. 464, 466 (1969) (noting that historically, "Connecticut statutes have distinguished between common-law robbery and robbery with violence," but finding that the offense in that case, which involved the threatening use of an unloaded gun, was in the latter category); *State v. Williams*, 202 Conn. 349, 357 (1987)

(observing that the force sufficient to effect a purse-snatching without more may constitute simple robbery, although the force used in that case actually did result in physical injury).

Prior Connecticut Supreme Court and lower Connecticut appellate court cases also indicate that the basic robbery statute has, indeed, been applied to cases involving fairly low levels of force. For instance, in *State v. Crump*, 201 Conn. 489 (1986), the Connecticut Supreme Court upheld a second degree robbery conviction where the entire use or threatened use of force consisted of hurriedly pushing a cashier away from an open cash register.[12] *See id.* at 494. Other Circuits have also concluded that force comparable to that discussed in *Wright* and *Crump* is not sufficient under 2010 *Johnson*. *See, e.g.*, *United States v. Parnell*, 818 F. 3d 974, 979–80 (9th Cir. 2016) (observing that the force used to accomplish a purse-snatching, "jolting [the victim's] arm and shoulder," "grabbing [the victim's] jacket," or engaging in a "minor scuffle" was not sufficient); *United States v. Gardner*, 823 F.3d 793, 803 (4th Cir. 2016) (observing that "pushing the victim's hand off a carton of cigarettes" or "pushing the shoulder of [the victim], causing her to fall onto shelves" was not sufficient).

Cases involving implied threats of unspecified force have also been upheld. *See, e.g.*, *State v. Littles*, 31 Conn. App. 47, 55 (1993) (upholding a second degree robbery conviction where the defendant parked in a deserted area and watched as his companions approached the

---

[12] The full fact pattern was described by the Court as follows:

> On the date in question, the defendant entered a restaurant in Hartford with two other black males. The three then had a conversation among themselves, after which the defendant and another of the men went to the counter near the cash register while the third left the restaurant. One of the two men who remained (the defendant or his companion) ordered a soft drink at the counter and money was proffered to the victim, Julia Pelarinos, for the drink which was presented. When Pelarinos opened the cash register to deposit the money, she was pushed aside by the man who had ordered the soft drink. He then took approximately $300 from the opened cash register drawer. The two men immediately hurried from the restaurant. The man who did not take the money from the cash register opened the door "to assist" the man with the $300 to leave. After exiting the restaurant, both entered a waiting automobile "being operated" by the third man, who had left the restaurant earlier. The automobile then left the scene.

*State v. Crump*, 201 Conn. 489, 492 (1986).

victim, told him to hand over his coat and necklace, and told him to run away after he did so[13]).

Although common sense suggests that such indirect threats potentially include a threat of violent

physical force, I note that the comparable New York cases which the Second Circuit found

insufficiently violent in *Jones* apparently involved far more direct interference with the victim.

*See Jones*, No. 15-1518-cr (doc. 97) at 14–15 (citing to a case where the defendant and three

others blocked the victim's pursuit of a pick-pocket; where the defendant "bumped" the victim,

took money, and fled "while another forcibly blocked the victim's pursuit").

The government has not provided any data suggesting the above cases do not accurately

represent the Connecticut Supreme Court's view of section 133's force requirement. Thus, I hold

there is sufficient evidence that Connecticut's basic robbery definition does not necessarily

require the use of "violent force."[14] Accordingly, I must consider whether the aggravating

factors at issue in Shabazz's prior first and second degree robbery convictions require the

requisite level of force.

### i.   First Degree Robbery

Section 53a-134(a) provides that a person commits a first degree robbery under

Connecticut law if that person commits simple robbery, as defined in section 133, and also:

---

[13] I note that the victim in *Littles* also testified that he "heard two gunshots behind him" as he ran away, *State v. Littles*, 31 Conn. App. 47, 49 (1993), but the court did not discuss the possibility that the defendant or his companions were armed as part of its force analysis.

[14] At the hearing, I asked the parties to explore the suggestion in *United States v. Williams*, No. 3:12-cr-188 (VLB) (doc. 103), that because the Connecticut penal code is based on the New York penal code and frequently relies on New York case law, the New York cases discussed in *Jones* could also serve as proof that the Connecticut statute would be applied to non-qualifying conduct. After *Williams* was decided and before *Jones* was vacated, the government filed a petition for rehearing in *Jones* arguing that the panel had misconstrued those cases and providing citations to other cases indicating that violent force is required to meet New York's basic robbery definition. *See* Gov't's Post-Hearing Br. at 3, Ex. A. Without the benefit of Jones' responsive briefing, it seems to me that the government has now demonstrated real ambiguity regarding how the New York Court of Appeals might rule on that issue; however, because I hold that Connecticut law itself provides sufficiently persuasive evidence, I do not need to consider the impact of ambiguous New York case law here.

> (1) Causes serious physical injury to any person who is not a participant in the crime; or (2) is armed with a deadly weapon; or (3) uses or threatens the use of a dangerous instrument; or (4) displays or threatens the use of what he represents by his words or conduct to be [a firearm].

As a preliminary matter, I note that the government has provided me with the state court mittiumuses indicating that two of Shabazz's first degree robbery convictions fell under section 53a-134(a)(4) and one fell under section 53a-134(a)(2). Gov't Opp'n Br., Ex. 1, 2, 3. I have previously held that, even after 2010 *Johnson*, a conviction under section 134(a)(4) falls within the requirements of ACCA's Elements Clause.[15] *See Harrington v. United States*, 2011 WL 1790175, at *6 (D. Conn. May 10, 2011), *aff'd,* 689 F.3d 124 (2d Cir. 2012). I have not been convinced to depart from that ruling. Accordingly, I consider only whether Shabazz's conviction under section 134(a)(2) can be challenged as an ACCA predicate.

Section 134(a)(2) does not necessarily require the use of additional force. That section, which provides that a simple robbery is elevated to a first degree robbery if the defendant is armed with a deadly weapon, can be met even if the defendant does not display the weapon or threaten its use. *State v. Anderson*, 178 Conn. 287, 294 (1979) ("[I]t is not necessary for a weapon to be exhibited, displayed, utilized or referred to in order for one to be considered "armed" . . . [o]ne merely has to be armed."). The Connecticut Supreme Court has recognized that merely carrying a weapon does not, itself, even constitute the use of physical force, let alone the violent force required by 2010 *Johnson*. For instance, in *State v. Coston*, 182 Conn. 430 (1980), the defendant happened to be armed while committing a larceny, but did not display,

---

[15] In a post-hearing submission, Shabazz briefly argues that, because the subdivision can be met by "displaying" *or* "threatening the use" of the weapon, "display" must mean something less than threaten and accordingly allows that element to be met with something less than the "threat" of deadly force. *See* Pet.'s Post-Hearing Br. at 7–8 (doc. 22) I find that argument unconvincing—"threatens use" most reasonably refers to the verbal threat discussed by the rest of the subdivision (i.e. "what he represents is a firearm"), while "display" might refer to a non-verbal gesture nevertheless meant as a threat. Moreover, Shabazz has provided no authority suggesting that the Connecticut Supreme Court might agree with his reading.

threaten use of, or reference the weapon during the offense. The Court held that the concealed weapon did not constitute the use of physical force, and accordingly, did not meet the "forcible stealing" element of the Connecticut robbery statute. *See id.* at 438. That reasoning is in accord with the Second Circuit's observation in *Jones* that "the presence of a gun that a robber does not display, use, or threaten to use during a robbery [does not necessarily have] any effect on the nature of the force that the robber exerts on his victim," and therefore is insufficient to constitute a categorical requirement of violent force under the Elements Clause. *Jones*, No. 15-1518-cr (doc. 97) at 16.

Accordingly, I hold that Shabazz's first degree robbery conviction under section 134(a)(2) does not necessarily require violent force, and therefore cannot serve as an ACCA predicate under the Elements Clause.

### ii.  Second Degree Robbery

Section 53a-135(a) provides three aggravating factors elevating a simple robbery to a second degree robbery: (1) the person is aided by another person actually present during the crime; (2) the person or any participant displays or threatens the use of what is represented to be a "deadly weapon;" or (3) the person intimidates a bank employee for the purpose of overcoming resistance to the taking of property while in the course of committing larceny at the bank.

The government has not yet submitted documents indicating under which of the additional elements Shabazz was convicted for second degree robbery, although it noted in its opposition brief that it was seeking such documents from the State. *See* Gov't Opp'n Br. at 10 n.8. Without an indication regarding which aggravated factor applied in Shabazz's case, however, I must determine whether "the least of [the] acts" described in the statute can serve as an ACCA predicate. *See* 2010 *Johnson*, 559 U.S. at 137. Committing a robbery with the aid of

27

another says nothing about the level of force that must be used—indeed, all of the cases on which I relied above to determine that the basic robbery statute did not require the requisite level of violence, and many of the cases on which the *Jones* Court relied, involved multiple perpetrators.

Accordingly, on the basis of the documents provided thus far, I must also hold that Shabazz's second degree robbery convictions do not necessarily require violent force. I recognize, however, that the government may be able to demonstrate that Shabazz was, in fact, convicted on the basis of "display[ing] or threaten[ing] the use of what is represented to be a deadly weapon," which would provide proof of the requisite level of force. It will have an opportunity to do so at resentencing.

******

In sum, I must conclude that the 2015 *Johnson* error was not harmless. Without the Residual Clause, only two of Shabazz's prior convictions support his ACCA eligibility, which is insufficient under the statute. And without the ACCA enhancement, Shabazz would have been subject to a maximum term of 120 months of imprisonment, instead of the 235-month term that he received. Accordingly, Shabazz has demonstrated that his sentence must be vacated.

## IV.   Conclusion

In light of 2015 *Johnson*, Shabazz's petition is **granted**. His sentence is hereby **vacated**, and he is entitled to resentencing.

Resentencing is set for Monday, January 23, 2017 at 10:00 a.m. At the resentencing, "[i]t is the government's burden to establish whether a prior conviction qualifies under section 924(e)(2)," *Wiggan v. United States*, 2016 WL 4179838, at *5 (D. Conn. Aug. 5, 2016) (citing *United States v. Rosa*, 507 F.3d 142, 151 (2d Cir. 2007)); accordingly, the government should

submit any additional *Sheppard* documents and briefing within one week of this Order, and

Shabazz shall then have one week to file responsive materials.

So ordered.

Dated at Bridgeport, Connecticut, this 3rd day of January 2017.

/s/ STEFAN R. UNDERHILL
Stefan R. Underhill
United States District Judge